[Cite as *Zirafi v. Green Mile Ents., L.L.C.*, 2025-Ohio-2862.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CHRISTINE ZIRAFI, M.D., ET AL.,    :

      Plaintiffs-Appellants,    :

                              No. 114423

      v.    :

GREEN MILE ENTERPRISES, LLC,    :
ET AL.,

                            :

      Defendants-Appellees.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 14, 2025

---

Civil Appeal from the Cuyahoga County Common Pleas Court
Case No. CV-23-984804

---

### *Appearances:*

Byron Legal LLC and Evan T. Byron, *for appellants*.

Ogletree, Deakins, Nash, Smoak & Stewart, P.C., and
Komlavi Atsou, *for appellees*.

---

KATHLEEN ANN KEOUGH, J.:

{¶ 1} In August 2023, Christine Zirafi, M.D. ("Zirafi"), Susan Zanetti ("Zanetti"), and Raju Modi, M.D. ("Modi"), all named individually and as creditors and assignees by the U.S. Chapter 7 Bankruptcy Trustee in *In re: Darrin B. Farrow*,

N.D. Ohio Bankr. No. 19010747-AIH (collectively "appellants"), refiled a complaint against Green Mile Enterprises LLC, Santo Meri LLC, Green Mile Solutions LLC, Green Mile Wellness LLC, Clean Remedies, LLC, Meredith Farrow ("Meredith"), and John Does 1-10 (collectively "appellees" or "appellee entities"). The complaint alleged that the appellants transferred and entrusted funds totaling $500,000 to Darrin Farrow ("Darrin") for investment in Darrin's cannabis venture called MAD Oregon LLC ("MAD Oregon").

{¶ 2} According to the complaint, Darrin defrauded appellants and used MAD Oregon as a mechanism for completing and perpetuating the alleged fraud. The complaint advanced 17 causes of action: successor liability; theft by deception; unjust enrichment; money had and received; constructive trust; breach of fiduciary duty; accounting; misappropriation; avoidance and return of all transfers due to actual and constructive fraud under R.C. 1336.04(A)(1) and (2) and 1336.05(A); civil conspiracy; declaratory judgment; conversion; injunctive relief; piercing the corporate veil; and trustee claims under 11 U.S.C. 541, 544, 548, and 550.

{¶ 3} Neither Darrin nor MAD Oregon were named as defendants in this refiled matter. The complaint explained that Darrin had filed for bankruptcy and his equity in MAD Oregon was named as an asset; thus neither Darrin nor MAD Oregon could be named in the complaint. The complaint alleged that while Darrin and MAD Oregon created and perpetuated the fraud, the named defendants, i.e., appellees, were involved at the "back end" of the fraud. The complaint further alleged that their investment was used to fund the appellee entities instead of MAD

Oregon. According to the complaint, Darrin's wife, Meredith, organized all of the appellee entities "in an effort to evade and defraud [appellants] and other creditors as well as exclude them from anything related to the [appellees]." The appellants attached 48 exhibits to the complaint, which will be discussed as relevant herein.

### I. Factual Background

{¶ 4} The complaint detailed that Darrin is "a disgraced financial planner and investment advisor." Appellants were Darrin's clients and had previously made many investments with Darrin that were "generally limited to publicly traded equities and mutual funds." In 2015, Darrin solicited appellants to purchase unregistered securities in MAD Oregon. Zirafi and Zanetti, who are married, invested a combined $250,000, and Modi invested $250,000 through his investment company. Aside from a "PowerPoint document," Darrin did not "provide [appellants] with any documentation, SEC filings, or other paperwork prior to their investments" and instead "made a myriad of oral promises and other fraudulent misrepresentations/omissions to them[.]" Nonetheless, Zirafi and Modi both signed documentation signifying their investment in MAD Oregon.

{¶ 5} Despite their investment in MAD Oregon, appellants never received any K-1 tax documentation from Darrin for 2015 or 2016 and he "kept [appellants] in the dark." In 2020, Zirafi finally received a K-1 form from her investment for 2015. The complaint alleges that Darrin, at one point, "advised [appellants] that MAD Oregon was changing its name to 'Green Mile' or something similar."

**{¶ 6}** As a result of an investigation by the Securities and Exchange Commission, Darrin was eventually "terminated" from his firm of investment advisors for soliciting investments without the firm's knowledge. Zirafi received a notice of this investigation and discussed it with Darrin, who purportedly reassured her that he was "not really" under investigation. On June 23, 2016, Darrin "admitted" to the allegations in an agreement; Darrin's license was temporarily suspended, and he was assessed a fine. Zirafi received a settlement because of this investigation.

**{¶ 7}** The complaint further details that in August 2017, appellants "demanded a face-to-face meeting" with Darrin. Apparently, during the meeting, Darrin informed appellants that they were investors and/or owners of Green Mile Enterprises LLC, an entirely new company, separate from MAD Oregon. During this meeting, Darrin also assured appellants that they would begin to see "$20,000/month distributions" beginning in September 2017. The appellants do not have any documentation reflecting their investment or ownership in Green Mile Enterprises, LLC.

**{¶ 8}** In June 2018, Zirafi's counsel sent a letter to Darrin asking for information and documents related to her investment. Darrin's attorney relayed that Darrin had "not yet finalized the documentation regarding the migration of the MAD Oregon investors to Green Mile which is still in process." According to appellants, these documents were never provided.

{¶ 9} In 2018, Darrin's home was foreclosed upon, and in February 2019, Darrin filed for bankruptcy. Appellants were eventually added to the bankruptcy action as creditors; this amendment also revealed that Darrin solicited "another $500,000 in unaccounted for investment dollars" from other individuals.

{¶ 10} Based on the foregoing, the complaint infers that the appellee entities are successor entities to MAD Oregon because the operating agreement for the "Green Mile" defendants displays the same address, operations, and purpose as those presented in the MAD Oregon operating agreement. The complaint relies on the inference that "the Farrows [Darrin and Meredith] used [appellants'] $500,000 and presumably other sources of capital to fund their 'Green Mile' enterprise," but under Meredith's name and control, "in an effort to evade and defraud" appellants and others.

{¶ 11} In June 2024, appellees filed a motion for summary judgment. Between July 2024 and August 2024, appellants filed five motions asking the court for an extension of time to respond to the motion for summary judgment and filed their proposed brief in opposition to the motion for summary judgment on August 29, 2024.

{¶ 12} The court denied the request for an extension of time and struck the proposed brief in opposition from the docket entirely, to which appellants responded on September 4, 2024, with a motion for reconsideration. On September 5, 2024, the trial court issued a journal entry finding appellees' motion for summary judgment was "unopposed and granted" but also included language indicating that

the court "considered" and "construed the evidence" and found that appellees were entitled to summary judgment as a matter of law.

{¶ 13} This appeal followed, and appellants assigned the following errors for our review:

> 1. The trial court committed reversible error in granting Defendants-Appellees' motion for summary judgment.
>
> 2. The trial court committed reversible error in denying Plaintiffs-Appellants' motion for extension of time.
>
> 3. The trial court committed reversible error in denying Plaintiffs-Appellants' motion for reconsideration.
>
> 4. The trial court committed reversible error in failing to include an opinion with its summary judgment decision.

## II. Law and Analysis

{¶ 14} We review a trial court's decision on a motion for summary judgment de novo. *See, e.g., Corder v. Ohio Edison Co.*, 2024-Ohio-5432, ¶ 9. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists for trial. *Dresher v. Burt*, 1996-Ohio-107, ¶ 17-18. The moving party has the initial responsibility of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Id.* In motions for summary judgment, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment, which include "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts

of evidence, and written stipulations of fact, if any." Summary judgment may be rendered where the Civ.R. 56(C) evidence provided by the party seeking summary judgment clearly establishes that the nonmoving party has no legally cognizable cause of action. *Dresher* at ¶ 28.

{¶ 15} Appellants' brief infers that the trial court granted summary judgment because it was unopposed, despite the trial court's assertion to the contrary that it specifically considered and construed the evidence. Nonetheless, summary judgment must be affirmed if the trial court's judgment is supported by any of the grounds raised by the moving party, even if the trial court failed to consider those grounds. *Desir v. Mallett,* 2015-Ohio-2124, ¶ 16 (10th Dist.) citing *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist. 1995).

{¶ 16} Appellees contend that appellants have no evidence to establish a material element that is necessary to resolve each of their claims, but frame this as a standing argument when it is more akin to a merit-based argument. We nonetheless consider whether appellants have any evidence supporting the causes of action in their complaint, establishing a genuine issue of material fact. A moving party does not meet the Civ.R. 56 burden through conclusory assertions that the nonmoving party has no evidence to prove its case. *Dresher* at ¶ 17. "The assertion must be backed by some *evidence* of the type listed in Civ.R. 56(C) which affirmatively shows that the nonmoving party has no evidence to support that party's claims." (Emphasis in original.) *Id.*

## A. Preliminary Matters

{¶ 17} We disregard all of appellees' arguments about the statutes of limitations. This matter is a refiled case that was first initiated in 2019 and again in 2021. The dismissal order in the 2021 case provided that the "[p]arties further agree and stipulate that any arguments regarding the statutes of limitations, savings statute, the double dismissal rule, and anything related thereto are hereby waived as long as [appellants] refile their action no later than August 31, 2023." The appellants filed the underlying action on that date. Therefore, appellees have waived all arguments related to any statutes of limitations and we need not consider them.

{¶ 18} Next, we address the John Doe 1-10 defendants. "In dealing with unnamed parties, the court must consider Civ.R. 15(D) in conjunction with Civ.R. 3(A)." *Kohout v. Church of St. Rocco Corp.*, 2008-Ohio-1819, ¶ 6 (8th Dist.). Under Civ.R. 15(D), "when the plaintiff does not know the name of a defendant, that defendant may be designated in a pleading or proceeding by any name and description. When the name is discovered, the pleading or proceeding must be amended appropriately." Under Civ.R. 3(A), an action is commenced by filing a complaint, "if service is obtained within one year from such filing upon . . . a defendant identified by a fictitious name whose name is later corrected pursuant to Civ.R. 15(D)." Here, appellants filed their refiled complaint on August 31, 2023. Summary judgment was granted on September 5, 2024. Given that a year had passed for service without amendment, the action was never "commenced" against the John Doe defendants. *See, e.g.*, *Kohout* at ¶ 7 (collecting cases).

## B. Successor Liability

{¶ 19} Appellants' complaint alleges a theory of successor liability, i.e., they seek to hold appellees liable for Darrin and/or MAD Oregon's misdeeds. The complaint specifically makes these claims pursuant to the test set forth in *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344 (1993), which held that "[t]he well-recognized general rule of successor liability provides that the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation" except for when any of the four enumerated factors are found. *Id.* at 346.

{¶ 20} Before reaching the four factors, however, *Welco* provides a general rule for successor liability that relies on a purchase between the two entities. While there may be genuine issues of material fact as to Darrin and/or MAD Oregon's misuse of their investment dollars, it is still incumbent upon appellants to demonstrate that the named appellees have absorbed Darrin and/or MAD Oregon's liabilities under a theory of successor liability. Appellants have not met this burden. In the complaint, appellants alleged that Darrin had advised them that "MAD Oregon [LLC] was changing its name to 'Green Mile' or something similar." However, according to Zirafi's deposition testimony, she recalls that the meeting went as follows:

> I recall that [Darrin] was very vague again about what was going on with the business. And we found out at some point that the person in charge of growing, or the cultivator, there had been a split-up with Darrin, and some different things with the company. And he was still

running it, though, and things were delayed, and that type of thing, and then he was going to bring somebody else in.

. . .

And then it — and so they were switching names of the company, also.

(Zirafi Dep. 34-35.)

{¶ 21} Modi could not recall whether he attended this particular meeting or not, but testified that Darrin personally told him about the "Green Mile" investments at some point and that "[t]here were conversations with Dr. Zirafi. . . ." (Modi Dep. 39.)

{¶ 22} Despite the allegations in the complaint alleging that "[t]he only logical inference here is that [appellants'] investment dollars were used to fund [appellees]" and that appellees "were the . . . transferees of [Darrin] and MAD Oregon's fraudulent transfers," appellants admit that they do not have any evidence, beyond their speculation, to establish that their investment dollars given to Darrin were provided to or otherwise funded appellees. Speculation is not Civ.R. 56(C) evidence. Furthermore, appellants do not claim to have evidence beyond their own speculation that their investments provided to Darrin for investment in MAD Oregon LLC were transferred or entrusted to any of the appellees, let alone purchased by appellees. (Zirafi Dep. 64, 65; Zanetti Dep. 40-41; Modi Dep. 22, 54-60, 74.) Appellees' motion for summary judgment included an affidavit from Meredith averring that "[a]t no time following [appellants'] investment in MAD Oregon did [Darrin] transfer any of [appellants'] investment dollars" to Clean Remedies, LLC and Santo Meri, LLC, the two organizations in which Meredith is the

sole member. The alleged reassurance by Darrin's attorney that appellants were now members of one of the "Green Mile" entities is not supported by the record. In a letter dated July 19, 2018, Darrin's attorney stated that "Darrin has not yet finalized the documentation regarding the migration of the MAD Oregon investors to Green Mile which is still in process." This is not a representation that the appellees' investments had been migrated to an entity other than MAD Oregon.

{¶ 23} This proper Civ.R. 56(C) evidence refutes appellants' speculation that a transaction, transfer, or purchase occurred between Darrin and/or MAD Oregon with the appellees. Accordingly, appellees have established that there is no dispute of material fact surrounding the transfer of funds between Darrin and/or MAD Oregon and the appellees. Appellants' attempt to impute Darrin and/or MAD Oregon's liability to appellees fails as a matter of law.

**C. Theft by Deception, Money Had and Received, Civil Conspiracy**

{¶ 24} All of these claims are premised on appellants' theory of successor liability. Each of these causes of action allege that as the alter ego and/or successors of MAD Oregon, appellees are liable to them for all of the aforementioned causes of action. Since these claims are all premised on the theory that MAD Oregon sold its assets to any and/or all of the appellee entities. We have already established that appellants' claim for successor liability fails as a matter of law. Accordingly, these causes of action also fail as a matter of law.

**D. Unjust Enrichment, Constructive Trust, Accounting, Misappropriation, Avoidance and Return of Transfer, Declaratory Judgment, Injunctive Relief, Conversion**

{¶ 25} The unjust enrichment cause of action alleges that "[u]nder the facts and circumstances set forth herein, [appellees] will be unjustly enriched to the detriment of [appellants]" if appellants are allowed to retain the money that appellants invested with Darrin and/or MAD Oregon. Similarly, the constructive trust cause of action provides that "[u]pon information and belief, the only way that [appellees] have been able to enjoy their ongoing success is by virtue of the $1,000,000 that [Darrin] fraudulent[ly] procured from [appellants] and illegally funneled to [appellees]." The misappropriation cause of action asserts that appellees "used [appellants' investments] to set up and fund other ventures." The cause of action for conversion provides that "[u]pon information and belief, [appellees] are in possession of [appellants'] property."

{¶ 26} Appellants' accounting and avoidance and return of transfer causes of action only survive if appellants can provide evidence that Darrin and/or MAD Oregon transferred their invested funds to the appellees. *See* R.C. 1336.04(A) ("A transfer made or an obligation incurred. . . .") and 1336.05(A) (same language).

{¶ 27} In the cause of action for declaratory judgment, appellants seek a declaration that appellants are owners of and/or lienholders "against any and all entities that were in any way derived from their investment with [Darrin] in MAD Oregon." Similarly, appellants' claim for injunctive relief is dependent on a finding that appellants are "equitable owners and/or lienholders" of any of the appellee entities.

{¶ 28} All these claims are premised on a theory that Darrin and/or MAD Oregon transferred appellants' funds to appellees — a theory that the appellants have not supported with evidence, as discussed previously. Moreover, appellants admitted during their respective depositions that they are not listed as members in the operating agreements associated with the appellee entities. (Zirafi Dep. 66, 69; Modi Dep. 66-68, 70-74.) Regarding Zanetti, it is undisputed that she never personally made an investment in MAD Oregon but rather, provided $100,000 of her funds that Zirafi combined with her own $150,000 investment. Zirafi alone made the combined investment and signed the documentation with Darrin. Zanetti never directly contracted with Darrin for investment in MAD Oregon. This is corroborated by the documentation submitted as deposition exhibits. Accordingly, these claims also fail as a matter of law.

## E. Breach of Fiduciary Duty

{¶ 29} This claim was only pursued against Meredith and the John Doe defendants. To establish that Meredith breached her fiduciary duty to appellants, they must prove "(1) the existence of a fiduciary duty; (2) the failure to observe the duty; and (3) an injury resulting proximately therefrom." *DPLJR, Ltd. v. Hanna*, 2008-Ohio-5872, ¶ 19, citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 216 (1988). "In determining whether a fiduciary relationship has been created, the main question is whether a party agreed to act primarily for the benefit of another in matters connected with its undertaking." *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 43.

{¶ 30} Zirafi testified that she did not provide the combined funds intended for MAD Oregon to Meredith, nor was Meredith ever present during discussions with Darrin about the MAD Oregon investment. Zirafi also conceded that Meredith was not a member of MAD Oregon. (Zirafi Dep. 25, 32, 43.) Zannetti and Modi testified the same. (Zanetti Dep. 27; Modi Dep. 21-22, 32, 54-55, 57.)

{¶ 31} Accordingly, there is no evidence of an agreement between appellants and Meredith where Meredith "agreed" to act on their behalf. Additionally, appellants do not have evidence that their funds were entrusted to Meredith, only to Darrin. Appellants' claim for breach of fiduciary duty against Meredith fails as a matter of law.

## F. Piercing the Corporate Veil

{¶ 32} In this "cause of action," appellants assert a theory that Meredith's actions and conduct "was so complete that the companies have no separate mind, will, or existence of their own" and appellants demand that the appellee entities be disregarded and instead hold Meredith personally liable for their damages. This relies on evidence demonstrating that Meredith received and misused appellants' money. Zirafi testified that she did not provide the combined funds intended for MAD Oregon to Meredith. We have already established that all three appellants admitted during deposition that they do not have evidence demonstrating that Meredith received their investment money from Darrin. Accordingly, appellants' attempt to pierce the corporate veil fails.

## G. Trustee Claims Under 11 U.S.C. 544, 548, 550

{¶ 33} This cause of action stems from appellants' purchase or assignment of the Chapter 7 trustee's claims pursuant to 11 U.S.C. 544, 548, 550. This fact is undisputed by appellees. The notice of the sale and order approving the sale of these claims were produced as exhibits to appellants' complaint.

{¶ 34} We first note that appellees' reliance on counsel for the trustee's September 24, 2019 email is misplaced. The communication clearly states that "[w]e . . . were unsuccessful in finding anything we considered sufficient to pursue an objection by the trustee to the granting of a discharge to the debtor [Darrin]." This does not mean that there are no possible claims that the trustee could bring against anyone; it simply means that the trustee cannot find any reason to object to Darrin's discharge in bankruptcy as a whole.

{¶ 35} Meredith's affidavit provides that "[a]fter extensive examination of financial records, the bankruptcy trustee and/or counsel for the bankruptcy trustee determined that [Darrin] had no claims against [appellees] for the repayment of any debts[.]" While this is conclusory, self-serving, and hearsay, we note that none of the appellants, during deposition, could offer any specific claims that the trustee or bankruptcy estate may have had against these named appellees. Moreover, no evidence has been presented severing appellants' personal claims from those advanced as purchasers or assignees of the trustee. Accordingly, Civ.R. 56(C) evidence verifies that appellants were unaware of the existence of any claims that could have been made on behalf of the bankruptcy estate or the trustee.

{¶ 36} We caution that summary judgment is limited to the claims and defendants brought by appellants in this matter only. According to the notice filed in the bankruptcy proceeding, appellants purchased all the trustee's "rights, interests, claims, etc. arising and out of the [$]1,000,000 invested with Darrin Farrow and/or MA[D] Oregon, LLC" that necessarily could include defendants and claims other than those contemplated in the instant matter.

{¶ 37} Appellants' first assignment of error contesting the court's granting summary judgment in favor of appellees is overruled. We further overrule appellants' fourth assignment of error alleging that the trial court erred in failing to issue an opinion detailing its reasoning for granting summary judgment. "A trial court's mere failure to set forth detailed reasons for granting summary judgment is simply not a basis for reversal." *Ferguson v. Univ. Hosps. Health Sys.*, 2022-Ohio-3133, ¶ 71 (8th Dist.). Having discerned that summary judgment was properly granted, we need not reverse and remand for the trial court to issue detailed reasoning for its decision.

{¶ 38} Appellants' second and third assignments of error allege that the trial court erred in denying their requests for an extension of time to file their brief in opposition and erred in denying their motion for reconsideration of the final motion for extension of time with the proposed brief attached. To begin, motions for reconsideration of a final judgment in the trial court are nullities. *Bethlenfalvy v. Sun Newspapers*, 2000 Ohio App. LEXIS 2104, *5 (8th Dist. May 18, 2000).

{¶ 39} We turn to the denial of appellants' fifth motion for an extension of

time to respond to summary judgment. A court's decision related to extensions of time are left to the sound discretion of the trial court and will not be disturbed absent an abuse of this discretion. *Khoury v. Charter One Bank*, 2001 Ohio App. LEXIS 1496, *10 (6th Dist. Mar. 30, 2001). Upon review, we do not find and appellants fail to demonstrate that the trial court abused its discretion in refusing to grant a fifth motion for an extension of time. Courts retain the power "to control their efficient and prudent operation." *State ex rel. Richard v. Cuyahoga Cty. Bd. of Commrs.*, 100 Ohio App.3d 592, 597 (8th Dist. 1995). And, trial courts "always retain[] the inherent authority to control the docket and issue orders." *Wells Fargo Bank, N.A. v. Myles*, 2010-Ohio-2350, ¶ 20 (8th Dist.). Accordingly, this discretion was not abused in refusing to grant the extension of time.

{¶ 40} Appellants' second and third assignments of error are overruled.

{¶ 41} Judgment affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

EILEEN A. GALLAGHER, A.J., CONCURS;
SEAN C. GALLAGHER, J., DISSENTS (WITH SEPARATE OPINION)

SEAN C. GALLAGHER, J., DISSENTING:

{¶ 42} I respectfully dissent. The majority reframes the arguments advanced by Green Mile Enterprises LLC, Santo Meri LLC, Green Mile Solutions LLC, Green Mile Wellness LLC, Clean Remedies, LLC, and Meredith Farrow ("GM Defendants") from a question of standing to the merits of the underlying claims. This recasting of the arguments could impact long-standing, black-letter law. "Standing is a preliminary inquiry that must be made *before* a court may consider the merits of a legal claim." (Emphasis added.) *Kincaid v. Erie Ins. Co.*, 2010-Ohio-6036, ¶ 9, citing *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 2007-Ohio-5024, ¶ 27, and *Cuyahoga Cty. Bd. of Commrs. v. State*, 2006-Ohio-6499, ¶ 22. The question of a party's standing and the merits of a cause of action are separate concepts, a legal distinction the parties should well be aware of when crafting their arguments.

{¶ 43} I cannot join the majority's conclusion that the GM Defendants intended to discuss the merits of all claims presented instead of the standing argument actually raised. What should have been argued is not an issue for appellate courts to resolve. *See Snyder v. Old World Classics, L.L.C.*, 2025-Ohio-1875, ¶ 4, quoting *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 15, and *Greenlaw v. United States*, 554 U.S. 237, 243, (2008) ("'[O]ur judicial system relies on the principle of party presentation, and courts should ordinarily decide cases based on issues raised by the parties.'"). Further, the majority's conclusion appears to conflate the concept of standing with

the merits of the claims advanced without offering the appellants the opportunity to address the majority's analysis. *See State v. Tate*, 2014-Ohio-3667, ¶ 21.

{¶ 44} The GM Defendants advanced three arguments in favor of summary judgment: (1) that eight of the 17 enumerated claims were filed after the expiration of the statutes of limitations;[1] (2) that all of the plaintiffs lacked standing to pursue any of the claims; and (3) that the GM Defendants were entitled to summary judgment on the merits of three of the claims: theft by deception, piercing the corporate veil, and successor-liability. Thus, the lack-of-standing argument was the only one that would result in a complete judgment in the GM Defendants' favor.

{¶ 45} The sole argument presented by the GM Defendants in their motion for summary judgment as to the merits of three of the 17 claims was that the investors failed to present any facts or evidence supporting those claims. The moving party, however, must identify those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Only when that burden is satisfied does the nonmoving party then have a reciprocal

---

[1] The GM Defendants have inexplicably demonstrated a complete disregard for their waiver of the statutes of limitations as an affirmative defense, failing to even acknowledge or address its existence in this appeal. That waiver, however, is of public record in one of the earlier filings of this action. *See State ex rel. Everhart v. McIntosh*, 2007-Ohio-4798, ¶ 10 (concluding that it is appropriate for a reviewing court to take judicial notice of a dismissal entry in an earlier case between the parties in deciding the appeal). Because the GM Defendants purportedly waived the statutes of limitations as a defense and have failed to articulate any reason for that waiver to be ineffective, *see* App.R. 16(A)(7), the trial court's decision granting summary judgment cannot be based on the statutes-of-limitations argument.

burden to establish facts showing that there is a genuine issue for trial. *Id.* Simply arguing that the plaintiff lacks evidence does not satisfy the moving party's burden under Civ.R. 56.[2] *Id.* ("The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case.") *Id.* But even if the limited argument presented were deemed sufficient, at most the GM Defendants would be entitled to a partial judgment on less than all of the claims based on their framing of the issues.

{¶ 46} Although I would address the standing arguments as presented, those arguments lack merit.

{¶ 47} There is disputed evidence supporting the plaintiffs' standing to pursue the allegations in the complaint. Forty-eight documents were attached to it. Neither party discusses the propriety of those attachments, but in general, "items properly incorporated within the complaint may be considered." *Katz v. Univ. Hosps. Health Sys.*, 2022-Ohio-3328, ¶ 12 (8th Dist.), citing *Woods v. Sharkin*, 2022-Ohio-1949 ¶ 31 (8th Dist.), and *Vail v. Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 280 (1995). Although the investors' attachments may not

---

[2] The GM Defendants also argue that (1) the theft-by-deception statute does not provide a private right of action despite R.C. 2307.60, which creates a civil cause of action for damages resulting from a criminal act such as theft by deception; and (2) that piercing the corporate veil is not a stand-alone claim. Neither argument has merit. As the GM Defendants acknowledge, R.C. 2307.60 creates a private cause of action for damages stemming from a criminal offense, and insomuch as piercing the corporate veil is not a claim, it is a measure of damages. The complaint simply puts the defendants on notice of their intent to seek damages against Meredith in her individual capacity. There is no basis to grant them a judgment on that allegation.

necessarily have been properly incorporated in the complaint under Civ.R. 10(D), the GM Defendants have not objected to consideration of those documents as part of the pleadings under Civ.R. 56(C). *Id.* at ¶ 12, fn. 3. Those documents, along with the allegations of the complaint, undoubtedly establish that Zirafi has standing to pursue the claims.

{¶ 48} Under the GM Defendants' own framing of the issue, standing is defined as "a party's right to make a legal claim or seek judicial enforcement of a duty or right." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 2007-Ohio-5024, ¶ 27, quoting *Black's Law Dictionary* (8th Ed. 2004). Further according to them, in order to establish standing, the plaintiff must demonstrate an injury that is fairly traceable to the defendants' allegedly unlawful conduct and likely to be redressed by the requested relief. *Sonis v. Rasner*, 2015-Ohio-3028, ¶ 45 (8th Dist.). That black-letter law is not in dispute.

{¶ 49} That standing test is easily satisfied by the allegations in the complaint, advancing 17 causes of action broadly alleging an intent for the investors' capital investments to be used to secure the investors' rights in a Green Mile entity formed by Darrin to operate a cannabis business after MAD Oregon imploded. Darrin personally filed articles of incorporation for GM Enterprises, naming himself as a member of the organization. GM Enterprises' operating agreement expressly stated that it was formed "for the purpose of acquiring certain assets and assuming the lease located at 24621 S. Barlow Rd., Aurora OR 97002 and thereafter applying for licensure in Oregon as a cannabis cultivation and

processing facility." That property was the same "Barlow Property" referred to in Darrin's pitch material for MAD Oregon and corroborates a statement by the attorney for Darrin and a Green Mile entity that Darrin intended to "migrate" the MAD Oregon investors' capital investment to a newly formed Green Mile entity.

{¶ 50} If Darrin is alleged to have injured the investors by accepting significant seed money, he expressly did so on behalf of the later-formed Green Mile entity he represented. That entity could be just as liable for Darrin's conduct as Darrin himself.

{¶ 51} Darrin's ultimate ownership or shareholder status of any Green Mile entity is irrelevant to the question of standing, and the GM Defendants have not identified any authority demonstrating that an injured investor must specifically trace funds in order to recover for corporate misdeeds.  In their motion for summary judgment and repeated in this appeal, the GM Defendants in fact concede that HCH Investments has standing to pursue the claims advanced in the complaint.  Brief of Appellees, p. 11 ("HCH, rather than Modi, has standing to pursue the claims alleged in the Complaint.").[3]  HCH Investments' claims would be identical to Zirafi's, who invested for herself and on behalf of Zanetti.  If HCH Investments has standing, then so too, at the least, does Zirafi.

{¶ 52} The allegations implicate the GM Defendants as being the parties against whom liability arises, with Zirafi's injury being traceable to their conduct

---

[3] Modi signed the subscription agreement, the written instrument used to facilitate the disputed investment, as the manager of his company, HCH Investments, LLC.

and relief being available to redress the injury caused by the GM Defendants' retention of the capital investments without providing the investors an ownership interest in the entity formed with their investments. Agents acting on behalf of the GM Defendants expressly told Zirafi that her investment would eventually be migrated to a Green Mile enterprise operating at the same location as MAD Oregon and created by Darrin. That Darrin has not been included as a party defendant based on his personal bankruptcy or that the individual investors have no personal knowledge of the transfer of their investment to any of the GM Defendants is irrelevant to the standing question. The lack of standing was not a basis on which summary judgment could have been granted upon Zirafi's claims.

{¶ 53} I acknowledge that Modi and Zanetti did not directly invest with Darrin, impacting the question of their standing. Modi did so through his corporation, HCH Investments, and Zanetti through Zirafi. Instead of focusing on the question of standing for Modi and Zanetti, the investors alternatively argue that the GM Defendants' summary-judgment motion impermissibly shifted the burden to them to prove their case without their first demonstrating entitlement to relief. In the motion for summary judgment, the GM Defendants focused on their reductive version of the allegations in the complaint, which disavows any association between them and Darrin without any supporting documentation or citation to relevant and undisputed evidence. The GM Defendants' argument overlooks the fact that once raised, "[s]tanding is a preliminary inquiry that must be made *before a court may consider the merits of a legal claim*." (Emphasis

added.) *Kincaid*, 2010-Ohio-6036, at ¶ 9, citing *Ohio Pyro, Inc.*, 2007-Ohio-5024, at ¶ 27, and *Cuyahoga Cty. Bd. of Commrs.*, 2006-Ohio-6499, at ¶ 22. Being a question of law, it is an issue to be decided by a court based on prevailing legal authority as applied to the facts of the particular case. The GM Defendants provided none, and the majority tellingly avoids the discussion altogether.

{¶ 54} Because this case stems from a motion for summary judgment, the initial burden was on the GM Defendants to disprove Modi's and Zanetti's standing with undisputed evidence, legal analysis, and citations to relevant authority in support of their arguments. *Dresher*, 75 Ohio St.3d 280, at 293. It is a general principle that "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), syllabus.

{¶ 55} The GM Defendants' motion for summary judgment is devoid of any legal analysis to support the standing argument. After reciting the above-mentioned black-letter law defining standing, they simply cited the subscription agreement signed by Modi on behalf of HCH Investments and addressed Zanetti's contribution through Zirafi. The cursory argument is not sufficient to warrant a judgment in their favor because it forced the trial court to produce its own analytical framework and supporting case authority beyond the singular reference to the black-letter law regarding standing. This is aptly demonstrated by the majority's

reframing of the summary-judgment motion to focus on the merits of the claims rather than the standing issue actually advanced.

{¶ 56} The motion for summary judgment should have been denied. The GM Defendants failed to establish an absence of genuine issues of material fact as to the claims presented in the complaint and otherwise failed to demonstrate entitlement to judgment as a matter of law. I would reverse the judgment and remand for further proceedings.